Michael D. Kimerer #002492
**KIMERER & DERRICK, P.C.**
1313 East Osborn, Suite 100
Phoenix, AZ 85014
Telephone: (602) 279-5900
Facsimile: (602) 264-5566
Attorneys for Defendant Karen Finley

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | No. 2:15-cr-00148-MHW |
| Plaintiff, | |
| vs. | **DEFENDANT KAREN FINLEY'S SENTENCING MEMORANDUM** |
| **KAREN L. FINLEY,** | (Before the Honorable Michael H. Watson) |
| Defendants. | |

Defendant, Karen Finley ("Finley" or "Karen"), by and through undersigned counsel, hereby submits this Sentencing Memorandum in advance of sentencing currently set for October 19, 2016, at 2:00 p.m. before the Honorable Michael H. Watson. This sentencing statement is more fully set forth in the attached Memorandum of Points and Authorities.

Respectfully submitted this 4th day of October, 2016.

KIMERER & DERRICK, P.C.

/s/ Michael D. Kimerer
Michael D. Kimerer
1313 East Osborn, Suite 100
Phoenix, Arizona 85014
Email: mdk@kimerer.com
Attorneys for Defendant Karen Finley

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    PROCEDURAL BACKGROUND

On June 19, 2015, Ms. Finley waived Indictment and pled guilty to one count of Conspiracy to Commit Bribery Concerning Programs Receiving Federal Funds and Honest Services Wire Fraud. Sentencing is set for August 10, 2016.

### II.    FACTUAL BACKGROUND

The factual background for this offense is fully set forth in the Statement of Facts attached to the Plea Agreement and, as such, only a brief overview of facts is included in this Memorandum. (Doc. 4-1).

In October 1998, Ms. Finley was hired by American Traffic Systems ("ATS") as Director of Operations. The company's reported business focus was to provide technologies such as red-light and speed photo enforcement systems. Ms. Finley was responsible for the operational staff, except accounting and sales, and she managed the customer relationships in Scottsdale (Arizona), Paradise Valley (Arizona), and Fort Collins (Colorado). In 1999, ATS was sold to Redflex Holdings PTY ("Redflex"). In around 2000 or 2001, Ms. Finley was promoted to Vice President of Operations for Redflex. In approximately 2001, Redflex, the parent company of Redflex Traffic Systems, Inc. ("RTSI" and/or collectively the "Company") out of Australia, hired Bruce Higgins to run the traffic safety business in both the United States and Australia. There were expansions within the business between 2001 and 2002 and also changes in staff. Between 2001 and December 2005, Ms. Finley was involved in the business in varying ways. The Company operated photo enforcement

1   systems in numerous cities in the United States and Canada, including several cities

2   located in Ohio.

3       In or around December 2005, Mr. Higgins left his position as President/CEO

4   and moved back to Australia. At that time, Ms. Finley was asked to fill the position

5   on an interim basis and, in March 2006, the promotion was made permanent. Elected

6   public officials in Columbus and Cincinnati solicited, received, and attempted to

7   receive campaign contributions from the Company through a consultant and lobbyist,

8   John Raphael, based in Columbus. The Company had been working with Mr.

9   Raphael in connection to business that the Company was seeking to obtain with

10  municipalities in Ohio. Ms. Finley was informed of the solicitations. Ms. Finley and

11  the Company agreed to provide the campaign contributions to the elected public

12  offices in return for the officials agreeing to take official actions on behalf of the

13  Company to obtain and retain municipal contracts. The Company, including Ms.

14  Finley, used Mr. Raphael to funnel pass-through campaign contributions to the public

15  officials by creating false and fraudulent invoices that would conceal or disguise the

16  nature and source of the funds. As a result of the contributions, elected public

17  officials performed, or attempted to perform, official acts that benefited Ms. Finley

18  and the Company.

19      In October 2007, Mr. Raphael requested a contribution of $30,000 and, after

20  internal discussion, the Company (with approval of Ms. Finley) paid the amount

21  through an invoice that was submitted by Mr. Raphael for "consulting services." She

22  knew at that time that the invoice was not for "consulting services" as it indicated. In

23

1 October 2009, Mr. Raphael requested another $5,000 from the Company and, after

2 discussions between Mr. Raphael and Aaron Rosenberg, the Executive Vice

3 President of Sales, the invoice was submitted to Ms. Finley for payment and she paid

4 the invoice. Mr. Raphael then paid the $5,000 to the elected official through a

5 contribution in his own name. In September 2011, Mr. Rosenberg received an email

6 from a public official discussing a possible $20,000 contribution and an invoice was

7 sent by Mr. Raphael for the $20,000 shortly afterwards. In October 2011, Ms. Finley

8 signed a "Memorandum of Understanding" to pay a "success fee" to Mr. Raphael

9 knowing that the money was not for its stated purpose but would be used for

10 campaign contributions.

11 **III.    SENTENCING GUIDELINE RANGE**

12     The Parties have stipulated to the following Sentencing Guideline

13 calculations:

14     12 – ***Base Level Offense*** (U.S.S.G. § 2C1.1)
      +2 – Involving more than one bribe (U.S.S.G. § 2C1.1(b)(1))

15     +8 – Value greater than $70,000 (U.S.S.G. § 2C1.1(b)(2))
      +4 – Involving elected public official (U.S.S.G. § 2C1.1(b)(3))

16     -3 – Timely acceptance of responsibility (U.S.S.G. § 3E1.1(b))
   _____

17     23 – ***Total Offense Level***

18      The Government has agreed that the Sentencing Guidelines changed in 2015

19 in the fraud loss table located at U.S.S.G. § 2B1.1. Under the current Sentencing

20 Guidelines, the offense level is increased by only six levels if the loss exceeds

21 $40,000, but is less than $95,000 and eight levels if the loss is between $95,000 and

22 $150,000. The parties agree that the change in the Sentencing Guidelines would

23

1  result in an additional 2 point reduction, for a total ***Advisory Guideline Range*** of ***21***

2  (37-46 months). It is requested that the Court allow this 2 point reduction in making

3  the sentencing guidelines calculation.

4      **IV.**    **GOVERNMENT RECOMMENDATION**

5          The Government has requested an additional 3 level downward departure

6  pursuant to U.S.S.G. § 5K1.1 because Ms. Finley cooperated in this case and also in

7  the Chicago case where she testified. The result is a recommended offense level of 18

8  with a sentencing range between 27 and 33 months.  The Government has indicated

9  that they may recommend a sentence at the lower end of the Guideline Range.

10      **V.**    **PRESENTENCE RECOMMENDATION**

11          The Presentence Report was completed back in July 2015. At that time, the

12  PSR was using a Total Offense Level of 23, which did not include the 2 level

13  reductions for the change in the 2015 Sentencing Guidelines. The PSR recommends a

14  sentence of 30 months, which equates to a downward departure of at least 4 offense

15  levels, and must be based on §3553 factors since the 2 point reduction and

16  cooperation under §5K1.1 are not factored into this recommendation.

17      **VI.**    **LEGAL ARGUMENT**

18          The Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005),

19  held the Sixth Amendment permits the sentencing court to give consideration to the

20  Federal Sentencing Guidelines, but the Court may tailor the sentence upward or

21  downward in light of other considerations to impose a reasonable sentence.

22  *Kimbrough v. United States*, 552 U.S. 85, 101, 128 S. Ct. 558, 570 (2007). In

23

1  *Kimbrough*, it was held that the district court did not abuse its discretion by imposing

2  a sentence below the Guidelines because the Guidelines' sentence yielded a sentence

3  "greater than necessary" to achieve the sentencing statute's purposes. *Id.* at 110-11,

4  128 S. Ct. at 575. Further, under *Kimbrough*, it is enough that the district court

5  considers the Guidelines, addresses the relevant statutory factors, and then imposes a

6  "reasonable" sentence, even if that sentence is lower than the Guidelines'

7  recommendations. *Id.* In short, the Guidelines are inspirational and there is no rule

8  requiring that "extraordinary" circumstances are found to justify a sentence that falls

9  outside of the Guidelines. *Gall v. United States*, 552 U.S. 38, 47, 128 S. Ct. 586, 594-

10  95 (2007).

11  The Court should begin all sentencing proceedings by calculating the

12  applicable Guidelines. Next, the Court should give both parties an opportunity to

13  argue for whatever sentence they deem appropriate after considering all of the

14  statutory factors found in 18 U.S.C. § 3553(a) to determine if they support the

15  sentence. *Gall*, 552 U.S. at 49-50, 128 S. Ct. at 596-97. The judge must make an

16  individualized assessment based on the facts presented and the totality of the

17  circumstances. *Id.* Lastly, the district court must explain the appropriateness of an

18  unusually lenient or harsh sentence with the sufficient justifications and the appellate

19  court will review the sentence under the deferential "abuse of discretion" standard.

20  *Id.*

21  The primary directive in § 3553(a) is for sentencing courts to "impose a

22  sentence sufficient, but not greater than necessary, to comply with the purposes set

23

forth in paragraph (2)." 18 U.S.C. § 3553(a). Section 3553(a) directs a court to consider, among others:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant. § 3553(a)(1);
>
> (2) the need for the sentence imposed [considering enumerated factors]. § 3553(a)(2); and
>
> (3) the kinds of sentences available. § 3553(a)(3).

§ 3553(a)(1)-(3). In considering the need for the sentence imposed, the Court should consider the following four factors:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

§ 3553(a)(2) (A)-(D). A review of all of these factors in this case warrants a sentence below the Guidelines and in the range requested by the Karen Finley.

## VII.   DEFENDANT'S SENTENCING RECOMMENDATION

Ms. Finley believes that a sentence of between 12 and 18 months is appropriate. She requests a sentence at the lower end of the sentencing range.  This recommendation, as set forth below, is based on a Guideline Adjustment, 18 U.S.C.

7

1   §3553 factors, and her U.S.S.G. §5K1.1 cooperation and assistance to the

2   Government.

3          She has also been providing further assistance to the Government in another

4   investigation which will be addressed more fully in an Addendum to this Sentencing

5   Memorandum under seal.

6          **A. GUIDELINES ADJUSTMENT**

7          Ms. Finley agrees that her Advisory Guideline Range is level 21 for a

8   sentencing range of 37-46 months if this Court should permit the 2 point adjustment

9   based on the 2015 change in the fraud loss table in U.S.S.G. § 2B1.1.  However, she

10  does believe there should be a downward departure of 8 offense levels based on §

11  3553(a) factors and cooperation under § 5K1.1.

12         **B. APPLICABILITY OF §3553 FACTORS**

13                1.  Nature and Circumstances of Offense

14         Karen accepts full responsibility for her conduct. She acknowledges that her

15  conduct was wrong and, worse, it was criminal. While she does not seek to make

16  excuses for her conduct, it is important to note that the fraud did not originate with

17  her. Karen walked into a position with the Company where fraud was already

18  occurring and, as a result, she put herself in a place where she became a party to it.

19  Although Karen might not have known at the time the full extent of her criminal

20  conduct, at a very minimum she acted with willful blindness. It is also important to

21  note that Karen did not profit or benefit directly from her conduct. Karen received a

22  salary from the Company and bonuses that did not vary due to her participation in

23

any illegal activity. Karen understands that the nature of her offense did provide a financial benefit to the Company and a detriment to other businesses that may have bid against Redflex. However, she did not receive any financial gain from her conduct where others engaged in the illegal conduct personally gained a financial benefit.

### 2.  History and Characteristics of the Offender

The PSR provided a good overview of Karen Finley's family and her background. Additionally, Ms. Finley has written a letter to the Court that details her life and the circumstances underlying the crime she committed. (See Finley letter attached as **Exhibit A**). She was born in Ohio in 1959, but was raised primarily in Denver, Colorado. She worked for Traveler's Insurance as a Commercial Account Manager in Chicago, Illinois and Denver, Colorado from 1980 to 1992.  She moved to Arizona in 1992 and went to work for Scottsdale Insurance Company as its Director of Corporate Services, where she remained until 1998. She left her position at Scottsdale Insurance Company to take a position with Redflex Traffic Systems.

While living in Phoenix she met her husband, Timothy Finley. The two married in 1999. They have no children but have four dogs that are like members of the family. Mr. Finley is the owner of Finley Consulting where he works as a logistics consultant for hospitals. Mr. Finley has been a logistics consultant for approximately 15 years. He is currently working through Leidos working at Terrebonne General Medical Center in Houma, Louisiana.

Karen has an Associate's Degree in Risk Management from the Insurance Institute. She completed the Leadership Development Program at the Center for Creative Leadership in San Diego. She then continued in her education and obtained a Bachelor of Science in Business Management from the University of Phoenix. She later obtained her Masters of Business Administration in Finance at Western International University.

Family, hard work and the love of animals, (especially dogs) have been the core of Karen's life. She has been devoted to assisting both her parents. Her 84 year old father, Raleigh Mabry, suffers from Alzheimer's, is wheel chair bound, and lives in a care center in Sun City, Arizona. Karen suffered the traumatic loss of her mother, Mary Jo, last month after she suffered a stroke. Karen has been the primary person overseeing her parents care, and has devoted hours each week attending to their needs. She had two sisters, Kathryn Mabry and Kelly Wang. Kelly died in 2013 from a massive heart attack at age 50. The loss of her sister was a severe blow to Karen and she sank into a deep depression, causing her to resign from her position at Redflex. It was shortly after her sister's death, she was notified she was going to be indicted. Her emotional distress has only been exacerbated by the stress of not being able to care for her parents, unemployment, and the uncertainty in her life knowing prison is in her immediate future.

Karen has always been active in supporting her community and helping others. Those that know her speak of her kindness and care for animals. She helped establish the Arizona Weimaraner Rescue, a not-for profit organization that rescues

homeless, abandoned, and surrendered dogs and helps them find "forever" homes. She has held fundraisers for the organization, serves on its Board, and is recognized as a champion for the care of abused animals.

Karen is a hard working woman. She is highly respected by members of the community, former co-workers, family, and friends. A number of individuals have written character letters on her behalf for the Court's consideration. (See Character Letters attached as **Exhibit B**). Only a portion of the letters are discussed below. The Office Manager for Redflex, Sandra Stevens, wrote a letter depicting Karen as a "generous, patient, and kind person to work with." She believed that Karen "dedication [] helped grow the company from 20+ employees to over 300." She also acknowledged that Karen worked with a "tough senior management" and she believes that Karen would not have committed this crime on her own had it not been for her position.

Karen's father-in-law, Gordon Finley, has witnessed the changes in Karen and her life due to the death of her sister and the "shame, humiliation and remorse Karen suffered in the wake of her conduct bringing her before this Court." Gordon Finley also believes that Karen's intentions in going to work Redflex were genuine. As someone who knows her well, he has seen her acceptance of responsibility and her desire to do whatever is required of her to make good for her conduct.

Karen's sister, Kathryn Mabry, gives the Court a great amount of detail about the type of person Karen truly is and the impact that her sister's death had on her. Specifically, she recounts the moment that Karen and Kathryn got the call that their

1    sister had suffered a heart attack – only a week after their father's hospitalization for

2    a heart attack. Even though Karen has "been living under the shame and fear of an

3    uncertain future as a result of her case…" she has continued to be the caregiver for

4    her parents and is responsible for taking them to their doctor appointments, running

5    their errands, and visiting them for hours on end to them cope with the loss of their

6    daughter and their fearful and lonely life inside a nursing home.

7          Finally, Karen's husband, Timothy, has written to the Court to urge leniency

8    for his wife of 17 years. He begs the Court to recognize that Karen is not defined by

9    her offense and remains a "wonderful wife, sister, and daughter to her dependent

10   parents." He talks about the importance of the Animal Rescue to Karen and the

11   lengths at which she goes to assist others in need. He recalls Karen's strong desire to

12   accept responsibility for her actions and to do whatever was requested of her to

13   cooperate with the Government and ensure that those individuals who needed to be

14   prosecuted were prosecuted right along with her – no matter the consequence to her.

15   He is afraid of losing her because "she is the corner stone of our family's existence."

16         Karen notes that to feel good about herself she has to work but trying to find

17   any kind of employment following her indictment has been next to impossible.  She

18   was able to get a job in the bakery at Fry's Market which paid minimum wage.  But

19   once publicity of her case in Chicago hit the newspapers she was fired.  She has not

20   sought employment since given the uncertainty of her future.

21

22

23

### C. COOPERATION

It is Karen's position that the 3 point § 5K1.1 reduction in the offense level is insufficient given her extensive cooperation in both Ohio and Illinois.  An 8 point reduction would be a better reflection of her cooperation resulting in an offense level of 13 with a sentencing range of 12-18 months. A sentence at the lower end of the range is recommended.

Karen's cooperation in this case is well established in the Government's sentencing recommendation (Doc.21), but extends far beyond Ohio.  Karen has provided a substantial amount of assistance to the United States Attorney in the Chicago companion case. She travelled to Chicago and spent four days working with the United States Attorney to prepare her testimony for trial.  She testified for approximately half a day, and her testimony was instrumental in the government obtaining convictions against the co-defendants.

In addition, Karen has continued to cooperate with the Government in other respects.  Ms. Finley is cooperating with Australian authorities in their investigation of Mr. Higgins, an Australian citizen. Redflex Traffic Systems Incorporated, the company Ms. Finley worked for, is wholly owned by the Australian company Redflex Holdings Limited. Redflex Holdings Limited is a company publically listed on the Australian Stock Exchange and is based in Melbourne, Australia. Mr. Higgins was in charge of the entire traffic division, including the United States and Australia. For a period of time, Mr. Higgins moved to the United States and maintained oversight of the United States and Australian operations from here. In April and May

1  2016, members of the Australian Federal Police requested through the FBI and Ms.

2  Finley's legal team, that she provide a written statement about her employment with

3  Redflex Traffic Systems. Specifically, the Australian Federal Police wanted

4  information on Mr. Higgins and any information about his role in the bribing of John

5  Bills. Ms. Finley has met with the Australian Federal Police and has cooperated fully

6  with their request for information. She has made it clear that she will continue to

7  fully cooperate in its investigation into Mr. Higgins. She understands that she is not

8  under investigation by the Australian authorities and that her cooperation with them

9  is solely a voluntary act on her part and she is not to receive any official benefit from

10  the cooperation.

11      Karen has never sought to make excuses for her conduct. She understands

12  that a prison sentence is likely in this case. All she asks is that the Court considers all

13  the information she has provided, including her substantial cooperation, and that the

14  Court sentence her to the least possible prison time so she can return to care for her

15  parents and start the difficult task of restarting her life.

16  **VIII.  SELF-SURRENDER**

17      It is requested that the Court allow Ms. Finley to voluntary surrender rather

18  than being taken into immediate custody. Self-Surrender is appropriate in this case as

19  noted by the PSR. Ms. Finley has been compliant with terms of her release and is not

20  a flight risk. Finally, Ms. Finley is set for sentencing in Chicago, Illinois on

21  November 10, 2016, which would cause a hardship if she were required to surrender

22  prior to that date. Therefore, Ms. Finley would request that she be allowed to self-

23

1  surrender and that the surrender date be set for a period of time after the November

2  10, 2016, sentencing in Chicago.

3  **IX.    FACILITY RECOMMENDATION**

4      It is also requested that the Court recommend to the Bureau of Prisons that she

5  serve her time in a minimum security camp at FCI Phoenix where she would be

6  closer to her husband and parents. Ms. Finley understands that the Court's

7  recommendation is only a recommendation and the ultimate determination is up to

8  the Bureau of Prisons.

9  **X.    CONCLUSION**

10     Ms. Finley does not minimize the seriousness of her conduct. She understands

11 that her actions directly contributed to a scheme that undermines the trust of the

12 American people to ensure their government and elected officials are acting within

13 proper bounds. Ms. Finley asks the Court to consider her cooperation, acceptance of

14 responsibility, and her background and that her conduct was not intended for any

15 personal financial gain. She has no prior criminal history and the deterrence effect of

16 this offense will last a lifetime. Ms. Finley is not likely to reoffend. More

17 importantly, she has done everything she can to ensure that the Court and the

18 Government understand her conduct is isolated and out of character and that when

19 she made a mistake she has done what is needed to make it right. The defense

20 recommended sentence in this case is sufficient to address the seriousness of her

21 offense and the necessary deterrence. Ms. Finley has shown a great respect for the

22 law throughout her life and, admittedly, suffered a very significant lapse in judgment

23

during her employment at Redflex. However, the facts and circumstances of this case, together with her ongoing cooperation, show that she will not reoffend and the public is sufficiently protected from any further crimes.

This case will have lifelong effects on her and her family and she is greatly remorseful for the harm she has caused to everyone involved. There are no words that can explain her regret. She is ready to accept the Court's sentence and begin to move forward in a positive direction.

It is requested this Court impose a sentence of 12 months.  This sentence is sufficient given her cooperation and background, and meets the sentencing directives. Further, Ms. Finley asks this Court to recommend that she be placed in a camp facility that is in Phoenix or the nearest possible location and that she is permitted to self-surrender at a date after her sentencing in Chicago.

It is requested the Court impose a sentence between 12 and 18 months.  Given all of the convictions and cooperation in this case, a sentencing in this range is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. §3553(a).  It is also requested that Ms. Finley be allowed to self-surrender on a date following her sentencing date in Chicago and that the Court recommend to the Bureau of Prisons she be incarcerated in a Camp Facility at FCI Phoenix.

1    Respectfully submitted this 4th day of October, 2016.

2                                        KIMERER & DERRICK, P.C.

3                                         /s/ Michael D. Kimerer
                                         Michael D. Kimerer
4                                        1313 East Osborn, Suite 100
                                         Phoenix, Arizona 85014
5                                        Email: mdk@kimerer.com
                                         *Attorneys for Defendant Karen Finley*

6

                         **CERTIFICATE OF SERVICE**
7
         I HEREBY CERTIFY on October 4, 2016, I electronically transmitted the
8
foregoing Sentencing Memorandum for Defendant, Karen Finley to the Clerk of the
9
Court using the CM/ECF System for filing and transmittal of a Notice of Electronic
10
Filing to the following registrants:

11   J. Michael Marous
     J. MICHAEL MAROUS
12   Assistant United States Attorney
     303 Marconi Boulevard, Suite 200
13   Columbus, Ohio 43215
     mike.marous@usdoj.gov
14
     Edward P. Sullivan
15   EDWARD P. SULLIVAN
     Trial Attorney, Public Integrity Section Criminal Division
16   U.S. Department of Justice
     1400 New York Avenue, 12th Floor
17   Washington, D.C. 20530
     Edward.Sullivan@usdoj.gov
18

19

20

21

22

23
                                        17

**Exhibit A**

October 5, 2016

The Honorable Michael H. Watson
United States District Court – Southern District of Ohio
Joseph P. Kinneary U.S. Courthouse, Room 109
85 Marconi Boulevard
Columbus, OH 43215

RE:     *United States v. Karen Finley*
        U.S. Dist. Ct. Case No. 2:15-cr-00148-001

The Honorable Michael Watson:

My name is Karen Finley. I am 57 (as of September 19) years old. I have never been arrested or convicted of any crime before this case. I have been married for 17 years to my husband, Tim. I participated in a scheme with my company, Redflex, along with other employees to provide campaign contributions to elected public officials in Columbus and Cincinnati. The elected public officials solicited and received campaign contributions from Redflex through a consultant and lobbyist, John Raphael. Raphael was working with Redflex on business Redflex was seeking to obtain with different municipalities in Ohio. I knew of the solicitations and agreed, along with the Redflex, to provide the campaign funds in exchange for the officials taking action so Redflex could obtain and retain municipal contracts. Raphael was used as a pass-through to conceal the nature and source of the funds. Redflex had created false and fraudulent invoices to conceal the nature of the money going to Raphael and, ultimately, the elected officials. I apologize to the Court, the Government, the citizens of Ohio, the competitors of Redflex, and to my family. I know that many people have lost trust in their government and feel betrayed. I am so sorry that my conduct has contributed to the public's cynicism and mistrust of city government.

I am ashamed and angry at myself for behaving in a manner that was inconsistent with the way I have lived my entire life. I have paid gravely for my conduct. I have destroyed my career and thrown away the good reputation that took me a lifetime to build. Despite my efforts at trying to find work, I am unemployed and fear that I may lose my home. I subjected myself and my family to terrible shame and public embarrassment, as this matter has been the subject of headlines in the local newspapers. I have lost an important part of my identity that I will never get back. I fear what lies ahead, and I am numb with terror. I suffer from severe anxiety and depression, for which I now take daily medication. I am sick about leaving my elderly father, who depends on me for everything.

The Honorable Michael H. Watson
October 5, 2016
Page 2

Formally accepting responsibility for my conduct, ironically, has allowed me to acquire some hope for my future. In the time between leaving Redflex and pleading guilty, I spent most of my days at home feeling embarrassed and depressed. My lack of a purpose served only to reinforce my shame and negative feelings about myself. There were many days where I did not want to get out of bed or leave my house. After I pled guilty and cooperated with the Government, something changed inside me. I regained a sense of myself and lost some of the shame that was paralyzing me. I even got a job in bakery at the local grocery store, which I enjoyed. Unfortunately, I lost that job about a month later when the grocery store heard about my case.

Redflex was a toxic and soul sucking place to work. I worked over ten hours a day, almost every weekend and never saw my family. Leaving Redflex allowed me the flexibility to take care of my elderly parents and spend the kind of time with them that I was not able to in the past. My father, Raleigh, 85, is wheelchair bound, suffers from dementia and has lived in a care center in Sun City West, Arizona for about five years. My mother died from a stroke in August of this year. Prior to her death, she suffered from severe neuromuscular degeneration and was also wheelchair bound and living in the care center. I am grateful that I have been allowed the time to take care of and spend time with my parents these last few years. Despite my father's worsening dementia, he still enjoys when I take him to his favorite local restaurant for dinner. My other passion near and dear to my heart is the Arizona Weimaraner Rescue. When I was working, I didn't have a lot of time to spare and used to only donate money. Now, I don't have money to donate, but I donate my time serving on the Board, planning and holding fund raising events, and fostering abused and abandoned dogs.

I hope that I am able to continue caring for and spending time with my father and the rest of my family. I am also hopeful that I will find meaningful employment after I am able to put this experience behind me. I will never forget the painful lessons I have learned. I will never be in trouble again. I will dedicate myself to being a lawful, productive, and helpful member of the community.

I was born in Columbus, Ohio in 1959. I am one of three children born to Raleigh and Mary Jo Mabry. My sister Kathryn, 58, lives in Phoenix, Arizona and is the project manager for a bank. My other sister, Kelly, died in 2013 at age 50 after suffering a sudden heart attack. In 1972, my father took a job in Denver, Colorado and we all moved there. Shortly thereafter, my father lost his job and my mom began working as a file clerk at an insurance company. She had no formal education or training, but she was able to keep us clothed, fed and in our house. During his unemployment, my father became very depressed, drank alcohol excessively, and even threatened suicide. My life was quite chaotic during that time and my mother seemed to be at her "wit's end." My father stopped drinking after a six week stay at a rehabilitation facility, after which he found employment. Somehow we all muddled through the stress and chaos and remained a very close-knit family.

The Honorable Michael H. Watson
October 5, 2016
Page 3

My mother's sense of survival and strong work ethic left a lasting impression on me and I
wanted to work hard like my mother. My parents could not afford to send me to college, so after
graduating high school in 1977, I took a job in retail. About a year later, my mom got me a job at
the insurance company where she had worked as a file clerk. This began my 20-year career in the
insurance industry. I started out as file clerk like my mother and worked my way through various
promotions and companies, ending up as Director of Operations for the Scottsdale Insurance
Company in Arizona. During my full-time employment at Scottsdale, I earned a bachelor's
degree in business management from the University of Phoenix. It was a very supportive
environment at Scottsdale. In fact, it was the human resources director from Scottsdale that
encouraged me to get a college degree. Scottsdale even paid my tuition in full. In October 1998, I
left Scottsdale and accepted a position as Director of Operations with American Traffic Systems
(ATS), a company that focused on red light and speed enforcement systems. As Director of
Operations, I was responsible for the operational staff (except accounting and sales) and I
managed some customer relations.

About a year later, I married Tim, who I had met while at Scottsdale. Tim currently
works as a logistics consultant for hospitals. Shortly after our wedding, we learned that I had
severe fertility issues. We did not have the financial ability to pay for aggressive medical
treatments that might or might not have worked, so we decided not to have children. At this time,
Tim, worked in consulting and was gone most of the week. With no children at home and Tim
travelling weekly, I spent most of my time at work helping ATS's then president (Barbara Miller)
grow and manage the traffic safety business. In July 1999, Redflex bought ATS's traffic safety
business. I stayed at Redflex and was promoted to VP of Operations in around 2000- 2001. My
parents were very proud and excited for me. I started out with no college education and went to
having a college degree and a VP job at a growing company. They were even prouder when I
became the CEO.

The parent company of Redflex was an Australian company. In around 2001, the parent
company put Bruce Higgins, an Australian, in charge of the traffic safety business in the U.S.
and Australia. Higgins became the CEO/President and I reported directly to him. In 2002,
Higgins hired Aaron Rosenberg as the VP of Sales and Marketing. In or around December 2005,
Higgins left his position as President/CEO and moved back to Australia. At that time, the Board
asked me to fill in as President/CEO on an interim basis. In March 2006, the promotion was
made permanent. I resigned from Redflex in 2013 after my younger sister Kelly's sudden death.

My relationship with Higgins was contentious from the beginning. He often ignored me
and got angry when I made suggestions that were contrary to his way of doing things. For
example, I remember when Dayton, Ohio selected Redflex to be their red light camera provider.
At the time, Redflex's U.S. division was cash strapped and did not have the financial
wherewithal to be able to deliver on the Dayton contract. Higgins tried to get me to sign the
contract. I told him that I was not comfortable signing a contract that Redflex was not in a

The Honorable Michael H. Watson
October 5, 2016
Page 4

financial position to perform (under the terms of the contract, Redflex was obligated to install the systems at intersections at its own expense). Higgins signed the contract himself.

Another time, around 2004, Higgins was supposed to release the company's half year results to the Australian Stock Exchange (the Australian company was a publicly traded company). I learned that the construction department had been erroneously reporting that certain systems were completely installed when they were not. I told this to Higgins because I believed the erroneous information would skew the company's half-year financial results. But, before I could finish, Higgins cut me off. He told me that he did not want to be made aware of anything that could change the numbers. These are just a few examples of how difficult it was for me to work under Higgins. Things became even more difficult when Higgins hired Rosenberg as the V.P. of Sales and Marketing. This led to the regrettable choices Redflex as a company, and me personally, made leading to the charges in Illinois. I participated in a scheme with Redflex, along with other employees, to give personal and financial benefits to John Bills, a City of Chicago official in charge of the red light camera program, in exchange for his assistance and championing of Redflex within the City of Chicago. I signed off on hiring Martin O'Malley to work at Redflex knowing he was not qualified for the job and knowing that it was done to appease Bills. While I was not involved in the conversations with Bills regarding payment of kickbacks, I intentionally avoided learning whether O'Malley passed any of his salary to Bills. I also ignored other questions O'Malley's compensation, asked no questions myself, and refused to acknowledge the request of Redflex's comptroller to renegotiate O'Malley's compensation. At the same time, I knew about and approved expenses for Rosenberg and O'Malley on behalf of Bills that I knew were improper benefits to Bills.

I do not think I will ever know the exact reasons that I participated in the fraud. Looking back now, I believe it may have been a combination of things, including a misguided sense of loyalty to Redflex, a fear of losing my job and having to look for new work, and an unfortunate desire to fit in. I think that I stopped thinking of myself as a CEO and just went along with what everyone wanted. I personally worked hard and believed that Redflex truly had a good product that enhanced safety in many cities. I did not personally benefit from my conduct. I received only my salary and bonuses, which were based on my overall performance at Redflex.

Of course, none of this justifies my conduct. I am so very sorry for my participation in letting the good people of Ohio and Illinois down. Although I can't go back in time and undue what I did, I have done everything I can to make amends for my conduct. I cooperated early on with the Government with respect to this investigation and the prosecution of others. I met with the US Attorney whenever they requested and testified in the Bills' trial. After Bills' trial, at the request of the Government, I met with the Australian Federal Police in their investigation of Higgins and provided them with a written statement regarding my conduct and the conduct of others. I hope my cooperation and public testimony at Bills' trial helps restore the public trust.

The Honorable Michael H. Watson
October 5, 2016
Page 5

      I now stand before you in judgment and respectfully ask you for a second chance. Before this case, I have been an honest and law abiding person my entire life. I understand that I will likely receive a prison sentence. But, I pray for leniency and for a sentence that allows me to return to my father so that I may care for him and be there for him in the last years of his life. I also hope for a sentence that allows me to return to my husband, family, and community so that I may re-start my life and again be a lawful and productive member of the community. I will not disappoint the Court. I will never be in trouble again.

      Thank you for taking the time to read this letter.

                 Sincerely,

                 Karen Finley

**Exhibit B**

Honorable George C. Smith
United States District Judge
Southern District of Ohio

25 June 2016

Dear Judge Smith:

My name is Timothy G. Finley. I am 57 years old and the husband of Karen Finley. We live in Cave Creek Arizona and have been married nearly 17 years. This is definitely the most difficult letter that I have ever had to write. It is not a struggle for me to write good things about Karen – that is easy. But, it is a terrible emotional struggle for me to write a letter asking for mercy for Karen. Karen is the most generous, kind, and caring person that I have ever met. She is a wonderful wife, sister, and daughter to her dependent parents. I hope that my letter reveals that Karen is not defined by the offense. Karen is not the kind of person that would intentionally harm anyone. She is not motivated by greed or a desire for material goods. Karen is most happy when she is with family and her dogs.

I first met Karen in 1997 at our previous place of employment. Now, I am a logistics consultant for hospitals through my own consulting firm, Finley Consulting, Inc. I am currently employed through Leidos working at Terrebonne General Medical Center in Houma, Louisiana. I have been a logistics consultant for approximately 15 years.

Karen and I have both been blessed with good health and up until recently because of the extreme collateral consequences of this case, have been financially secure. When we were financially secure, we enjoyed great travelling together. Another one of our shared joys is the work we do to support Arizona Weimaraner Rescue. Karen is on the Board of Directors for the rescue and has spent much time (and money when we could afford it) to help the rescue through fund raising activities at our home, by fostering dogs in need of a place to live while awaiting a forever home and through whatever help she can provide to the rescue as needed. Since we do not have children our dogs have become our children. If it were up to Karen, our house would be filled with more than the four dogs we currently have.

In 2013, Karen and I faced many of our toughest challenges. In February, Karen's youngest sister Kelly passed away from a sudden heart attack. She was only 50 years' old and was in good health. Karen and Kelly were extremely close, and we often went on vacations with Kelly and her husband. The sudden passing of Kelly caused extreme emotional distress for Karen and her family. The distress of this loss along caused Karen to finally re-evaluate her employment situation and tender her resignation. Among other things, Karen realized that the toxic and stressful environment at Redflex US had robbed her of precious time she could have spent with her family and enjoying her life.

Before this case, Karen planned to take a sabbatical for a few months and then begin searching for a new job with less pressure and in a better environment. Just as Karen was starting to feel herself again after Kelly's death, the current legal issues surfaced. Karen understood early on that she wanted to make amends for her conduct and took the path of pleading guilty and cooperating with the Government. Karen knew that this was not an easy road to travel down, but she was determined to try to stay productive and a contributing member of the community. Unfortunately, the relentless media attention on the case created a situation whereby she could not get a job or get on her feet. I remember how happy Karen was when she got a job working at a local grocery store, even though it was only minimum wage. Sadly, she was terminated after only a few weeks when her legal issues became front page news. Karen as devastated. She understood for sure how different her life would be under the stigma of this case. Making matters worse, I was unemployed at the time. A few months after Karen resigned from Redflex, I was laid off from my job. We had some savings and lived off of that for approximately a year and a half before I was able to find work again. Even so, we will also most likely have to sell our current home as it was purchased as a retirement investment at a time when we were both working and is now becoming hard to manage.

Also in 2013, my mom passed away. Karen's support to our family especially to my father has been crucial. She always has the time to support my father even though she is the primary caregiver for her invalid parents. I am certain my mom was comforted by knowing that Karen is still here for all of us today even though she is facing an uncertain future and extreme shame and remorse.

They say the hardest thing in the world is losing someone you love. Someone you grow old with and watch grow every day and someone who shows you how to love. It's the worst thing to ever happen to anyone. She brings me so much joy and she is my everything. These 17 years of being her husband has taught me how to love unconditionally. One day, when I look up from my phone, she won't be there anymore. She is the corner stone of our family's existence. Without Karen, we will all be lost.

As Karen's husband, I know that there is nothing she regrets more in her life than not leaving RedFlex sooner and participating in the conduct that led her before the Court. Karen has learned a great deal from this case. We all have. I am confident that if ever faced with a situation like this again, Karen would absolutely walk away. It is my greatest hope that the Court will be lenient in sentencing Karen. I pray that Karen is given a second chance to prove that she is an honest, worthwhile and productive member of the community. I also hope that for the sake of Karen's elderly parents she is given the opportunity to spend time with them and continuing taking care of them.

Thank you for considering my letter.

Very truly yours,

Timothy G. Finley

# John D. Wintersteen

Paradise Valley, AZ 85253

June 6, 2016

The Honorable George C. Smith, Senior Judge
United States District Court
Southern District of Ohio
Potter Stewart United States Courthouse
100 East Fifth Street
Cincinnati, OH 45202

Dear Judge Smith:

This letter is on behalf of Karen Finley. My name is John Wintersteen. I am a retired United States Marine Corps officer. Prior to my retirement after 29 years of service, in October 1994, I served as the head of Law Enforcement, Security and Anti-Terrorism in the Operations Division, Marine Corps Headquarters, Washington, DC. I also retired after 14 years of service as Chief of Police, Paradise Valley, AZ. I also served as the interim Chief of Police of Clarkdale, AZ, in rural northern Arizona, for a year, and as an active member of the International Association of Chiefs of Police Highway Safety Committee for many years where I was asked to participate as an advocate for photo enforcement of traffic laws.

This is the only time in my life I have written a letter to a judge at any level for consideration on behalf of a defendant awaiting sentencing. As a career law enforcement officer it is somewhat of an anomaly for me to be writing a letter asking for leniency for a defendant. But, I feel very strongly that Karen Finley is worthy of my letter and my plea for leniency. I would not write this letter if I had personally experienced a single incident of lack of integrity during the dozen years of our professional contacts.

Karen Finley is personally and singly responsible for saving many lives in the United States of America. At a desperate time, when it was very likely that the photo traffic enforcement industry was on the verge of failure as a business, and thus disappear from our nation, Ms. Finley took action. On a day-to-day basis, over several months, the company she served as Chief Executive Officer was close to being unable to make payroll, unable to pay vendors. At that time, the other companies in this budding industry were dropping their traffic enforcement programs, or not responding to requests for proposals. Ms. Finley negotiated with the Town of Paradise Valley, which I served as Chief of Police and Director of Public Safety, to purchase all of the hardware and software owned by her company, resulting in a one-time infusion of $225,000 in cash to the company. Not only did the Town of Paradise Valley, which has the longest continuously operating photo enforcement program in the United States, assure continuation of a crucial traffic safety program, this cash enabled the company to survive and saved the jobs of many people who shared my commitment to saving lives.

I was personally involved in these negotiations and Ms. Finley never acted improperly or unethically. Despite my knowledge of this case, I would gladly work with Ms. Finley again and I would testify as to her character at her sentencing at my own expense if this is possible.

Please take my letter into consideration in deciding Ms. Finley's sentence, particularly as it relates to incarceration.  I believe that she deserves credit for the lives her personal efforts have saved, and the disabling injuries not suffered, on our nation's streets and highways.

Sincerely,

John D. Wintersteen

June 14, 2016

Dear Honorable George C Smith:

My name is Kathryn Mabry. Karen Finley is my sister. While this is a very difficult letter to write, I am honored to say that I am the older sister of Karen Finley. I am a technology project manager with US Bank and have been with this company for a little over a year. I have however, been in the technology field within the financial services industry for 30 years.

I am nineteen months older than Karen and from the moment I heard I was going to be a big sister I knew how much I would love her. Nearly fifty-seven years later, I know that I could never ask for a better friend, confident and sister than her. As children, mother always said that I was a great leader and Karen was a great follower. She was always the shy one, the introvert, the pleaser, the obedient one. A typical story of her compassion, even then, was while in elementary school, she would be the one crying when the other children were disciplined and come home and tell Mother and me how wrong it was that the teacher scolded the other child.

This compassion, devotion, and loyalty, continued into her teenage and adult years and even now during this difficult time. Among Karen's numerous strengths are also her level headed approach to problem solving and her strong work ethic. Karen always gave her everything to those responsibilities entrusted to her. These include her family, her career, her volunteer work and her friends. She truly is one of the most loyal, hardworking and trustworthy people I have ever met.

In 2013 everything changed in our family. Our youngest sister, Kelly, passed away after suffering a sudden heart attack at age 50. When we got the call about Kelly, our father was still in the hospital having suffered a heart attack himself only the week earlier. Needless to say, Karen and I were immediately thrust into making decisions we never ever imagined we would have to make. The entire process seemed surreal – our baby sister was gone in an instant. Our grief and sadness were enormous, which only made the decisions even more difficult. One of us had to go immediately to Colorado where Kelly had passed away. One of us had to take care of our parents, who are both infirm and living in nursing homes in Arizona. Karen was in Florida for business, and without pause, traveled to another city in order to take the next flight out to get to Colorado. Sadly, Karen did not make it to Colorado in time to see Kelly before she passed. It was the darkest day in our lives. We are a very small and close knit family and this loss hit us so very hard. I left for Colorado the next morning and that week we buried our younger sister.

Shortly thereafter, Karen resigned from Redflex in order to spend more time with family. Karen's long hours at work and demanding schedule prevented her from being with those she loved. And, the stress of the job was so great, that even if she was with family, she was always thinking about work. Without the pressure of work, Karen was now able to devote time to our mother who is in 100% custodial care and our father who is battling Alzheimer's. Karen was

also able to spend time with her mother-in-law, who was fighting terminal cancer around this same time.

Karen thought that she would take a short time off of working and then get another job, hopefully in a less caustic and stressful place than Redflex. But, after this case broke, Karen was not able to keep a job anywhere. She even got a job at a local bakery, but lost that after a short time because of the publicity of her case.

Even though Karen's soul was broken by Kelly's death and she has been living under the shame and fear of an uncertain future as a result of her case, Karen has remained productive by taking care of our parents. Karen accompanies our parents to their multiple doctor appointments, runs all of their errands, and most importantly, visits with them for many hours on end to help them cope with the loss of their youngest child and the fearful and sometimes lonely life inside a nursing home.

Karen and I are very close and we talk about everything. I am desperately afraid for Karen and I feel terrible for her. Karen's remorse and shame are profound. She has apologized to me and she has openly acknowledged her conduct. Karen does not seek to blame others and has been extremely respectful of the legal process. She took her responsibilities very seriously in this case. I am proud of her courage. I am proud of the many steps that she has already taken to make amends for her conduct.

Karen has done all of this even though she struggles every single day with the consequences of her actions. She may never find another job because of her felony conviction. But, she will never stop trying. In the meantime, Karen has devoted her days to being our parents caregivers. Given my work schedule, I will forever be grateful to Karen for taking care of our parents. Karen also fills her days with her volunteer work with the Arizona Weimaraner Rescue, a cause that has been near and dear to her heart for many years.

My sister is a genuine, compassionate, and good human being. I know in my heart that she did not intend to harm anyone or personally benefit by her conduct. Still, Karen has owned her conduct and is genuinely remorseful for what she did. I am certain that she will never, ever, be in any kind of trouble again. As Karen's sister, I pray that you will give her a second chance and be as lenient as possible. I hope that I do not lose another sister. I know that my parents cannot handle losing another daughter, especially at this point in their lives. Please consider my letter as you render your decision in this case.

Thank you for your consideration,

Kathryn Mabry

June 29, 2016

Dear Honorable George C. Smith:

My name is Kathryn Mabry and I am writing this letter at the request of my parents, Raleigh and Mary Jo Mabry on behalf of Karen Finely, their daughter. Our parents are in a nursing home and are unable to write this themselves and if it pleases the court, I will be their scribe. As a matter of process I will make every effort to capture their quotes based on individual interviews I conducted with them. It should be noted that these conversations were quite short as our mother is physically 100% disabled and speaking is very difficult for her and our father has Alzheimer's and struggles with not only his memory, but also language.

Before I start with my parent's narrative, I want to state that Karen has been direct with our parents in telling them what she has done, but she has been very considerate of their failing health and limits the details to what they are able to process. I have been with her when she tells them of what she is accused of and her remorse, however I cannot be certain of their comprehension, even when I ask them directly. What I can attest to is that it makes them both very sad to discuss it and both of them cried during the interviews.

 I will write this in the order of the interviews with our mother's comments first.

Mother started by saying how much she loved Karen and she doesn't understand how this all happened to her "shy daughter". She then said that because she was so involved in her job at Redflex that she wasn't able to spend very much time with her and that her visits were limited to a few hours on the weekend if she was in town. She said that since Karen resigned in 2013 following the death of Kelly (her youngest daughter) "she can't get another job because of this" and she expressed how upset she is about that fact. Mother acknowledges often that she is grateful that Karen is her primary family caregiver taking her to all of her doctor appointments, running errands, managing the Care Center requirements on her behalf, most of their personal business (insurance programs, etc.) and spending hours with her each week watching TV and visiting. She is quick to cry when she thinks about the consequences of Karen's actions and that soon she might have to go away. She said "you know how lonely it is here and with you (Kathryn) working, it is a blessing to have Karen here". "I am afraid of how it will be when she has to go for sentencing, and if I will see her again" She speaks of this often and it causes her a great deal of distress.

Mother says that she has a very close and special relationship with Karen, and that ever since Karen was old enough to walk, she was Mother's shadow. Mother tells stories of Karen's empathy when her elementary classmates were punished. Karen would be the one crying during the time the teacher would be scolding the other children. She also relays stories of how frightened Karen was of so many things, the next door neighbor's oldest son, tornados, any strangers that tried to talk to her in a public place, and any type of change. Mother told me she was really worried about what will happen to Karen and how she will be able to "handle it".

Because of the layout of Karen's home, and since both parents are wheelchair bound, Karen has been the host for family gatherings since the parents entered the care center five years ago. Mother has expressed several times that she is sad that we won't be able to have those gatherings there anymore. Then she starts to cry again and between her sobs, she says how much it hurts to know that "we no longer have Kelly coming to these gatherings and I can't imagine how much it will hurt when Karen isn't able to be there either".

As I stated, conversations about Karen's situation are usually brief because my Mother will end up crying and as a result will end up suffering respiratory difficulty. It is our responsibility when we visit to minimize this distress as much as possible. But while the conversations may be brief, they occur each time I visit. She never fails to tell me how much she loves Karen and how sorry she is that she is going through this. I see the love in her eyes as she says these words and then just as soon as she says it, I see the fear. I quickly change the subject in an attempt to mitigate the grief, but I know she is struggling with her fear long after I leave.

Our Father's interview was much more difficult. As he is in the grips of Alzheimer's, it is not easy to determine specifically how much of the details of Karen's legal issues he fully grasps. I know that he understands "she is in trouble" and he asks me with each visit to explain what it is she is in trouble for. I explain in the simplest terms I can, and he just nods and tells me (often multiple times in the same visit as his short term memory is nearly non-existent) "what a wonderful and loving daughter Karen is and how much he loves her". He also says that "she is one of the most outstanding people he has ever known and I don't know what I would do without her. She does everything for me and Mom" He also cries with each visit and told me "I wish they would take me instead of her. She needs to take care of Mom".

As with our Mother, I have been there when Karen tells him about her situation and her expressions of remorse. I know he hears the words, and perhaps during that moment he is aware of it, but when he talks about her situation, it is strictly from the position of how much he "loves and needs her".

This is a difficult letter to write on behalf of our parents. I know how much this has hurt them and how they wish they could do something to help Karen. It is my greatest hope that you consider the loss they have already experienced with the death of Kelly and that your judgement is lenient so that they can have her with them for the short time they may have left.


Kathryn Mabry

On behalf of Raleigh and Mary Jo Mabry,

Honorable George C. Smith
United States District Judge
Southern District of Ohio

22 June 2016

Dear Judge Smith:

My name is Gordon L. Finley, the Father-in-Law of Karen Finley. I am retired from Northrop Grumman Corporation, and living in Sun City West, AZ. I was active in Contract Management and Program Management in the aerospace industry in both Southern California and the Kingdom of Saudi Arabia.

I have known Karen for nearly 20 years. During this period of time we have come to know her and love her as a vital and contributing member of our family. My wife passed away nearly 3 years ago and Karen's support to me during my grieving period was indispensable. She always had the time to support me, even though she was (and remains) the primary caregiver for her invalid parents. I am sure my wife was comforted by knowing that Karen is still here for me today.

During the past several years I have witnessed how Karen's life has undergone a complete upheaval. This was due to the sudden and unexpected death of Karen's younger sister in February 2013, followed by the shame, humiliation and remorse Karen suffered in the wake of her conduct bringing her before this Court. Despite these tragic events, Karen remains a caring and compassionate person.

We were all very happy and proud of Karen when she got the job at Redflex. I never would have believed that this job would lead to Karen being a convicted felon. Karen has apologized to me for her case and taken responsibility for her conduct. And, even though she has never sought to lay the blame on anyone else for her terrible predicament, knowing Karen the way I do, I know that she did not work at Redflex to break the law. Karen was very committed to Redflex and worked hard every day with the goal of public safety in mind.

Watching Karen live under the dark legal cloud of this case, I can say with more certainty than ever that Karen is a remarkable person. She held herself accountable for her conduct and did what she needed to do to make amends for her conduct. She has never asked me for sympathy or special treatment. To the best of her abilities she has made the effort of trying to stay productive. Trying to find a job with her legal status is not an easy task. I remember how happy she was when she was able to work in the bakery of Fry's Supermarket.

Sadly, after a few weeks, she was terminated due to her ongoing legal issues being against company policy. Even then she never had the "poor me" or "why me" attitude. Karen didn't give up. She marched on and tried to stay productive by continuing to take excellent care of her infirm parents and her efforts with the Weimaraner Rescue Association, which she has been involved in for many years.

As Karen's father-in-law, my hope is that the Court is lenient in sentencing her. I hope that she is given the opportunity to prove that she is a worthwhile and productive member of the community. She is definitely an excellent addition to my family. Thank you for considering my letter.

Very truly yours,

Gordon L. Finley

July 6, 2016

The Honorable George C. Smith
Joseph P. Kinneary U.S. Courthouse, Room 101
85 Marconi Boulevard
Columbus, OH 43215

Dear Judge Smith:

My name is Elise Pickering, sister-in law to Karen Finley. I live in Alexandria, VA with my husband, Colonel Trent Pickering (retired USAF) and his two teenage boys. I worked on Capitol Hill for sixteen years and have been a lobbyist for a little over ten years.

I have known Karen for almost 20 years and we have been family for 18 years. Although I live across the country from Karen, I have been blessed to consider her the sister I never had. She has been the rock of the family and ensures that everyone is cared for. She was a constant source of strength for my brother and my dad while my mother battled and eventually was taken by cancer. All the while, both her parents have been very ill and she has been involved in every detail of their care as well. This is no accident; Karen values family and puts them first. Tim, my brother, and I had vastly different upbringings and with the age difference, we never spent much time under the same roof except for when I was very young. Until Karen came into Tim's life, sadly, I didn't really have a close relationship with him. She changed that. To Karen, not being close and "there" for your family was something that was just plain unacceptable and she single handedly changed that.

Although my relationship with Karen is purely personal, I can tell you that she is a force who demands and commands the best out of people. Karen has not talked a lot about everything that has happened or transpired. But she has apologized and she has NEVER made an excuse for her actions. I think the only time I've witnessed any kind of frustration about her situation is when she lost her job at the bakery counter at Fry's grocery store. Her frustration was not motivated by self-pity but her desire to work and not sit around all day and wait. Karen is used to juggling multiple tasks and doesn't believe in excuses or being a victim. I do know the last couple of years Karen has truly struggled. The loss of her sister, Kelly, at age 51 (healthy vibrant woman had an unexpected heart attack) almost destroyed her. At about the same time is when Karen also realized her actions would destroy everything she had worked for her entire life. She has struggled to come to terms with her behavior and the sincere disappointment that she has let not only herself, but her entire family down. In addition to caring for her family, Karen has become more involved in the local Weimaraner rescue organization in Arizona. Yes, they are dogs, but she has made an effort to keep busy and make a difference in the lives of dogs that would otherwise likely suffer a painful death. Even as she waits her fate, and can't even keep a minimum wage job, she has still searched for a way to make a difference and continued to be thoughtful and compassionate.

Karen has never made an excuse about the situation she has created and has expressed her desire to pay her dues and start the next chapter of her life. I believe that Karen has a tremendous amount to offer our family and the community. It's my sincere hope that her sentence is a short one and that she

is given the second chance that she deserves.  Our parents rely on Karen and I know she will take the lessons she has learned and never make the same mistakes again.  Our family anxiously await her fate.  Karen's senior parents who are dependent on her do too.  Thank you for taking the time to read my letter.


Sincerely,

*Elise Pickering*

Elise Pickering

May 23, 2016

Re: Character Letter for Karen Finley

To: The Honorable George C. Smith:

My name is Sandra L. Stevens. I am currently the Human Resource Manager for Dillon Aero in Scottsdale, AZ, responsible for any and all Human Resource related topics. I am 43 years old and have lived in Arizona since the mid-late 70's.

I have known Karen Finley since approximately October 1998 when she came to American Traffic Systems as the Director of Operations. At that time, my current role was Office Manager. In July of 1999, Redflex Traffic Systems purchased American Traffic Systems, where Ms. Finley and I resumed our positions with Redflex. I then worked with Karen until her departure in February, 2013.

Karen was a generous, patient, and kind person to work with. Her dedication to the employees and the company was exceptional. An example of Karen's dedication that sticks out in my mind is how Karen once even used her own personal credit card to ensure employees would not be aware of the financial difficulties Redflex had experienced over many years. This dedication and honorable selflessness, allowed Redflex never to miss a payroll for their employees. Redflex was a tough environment and Karen stood out for her compassion and dedication to the employees. I also believe that it was Karen's dedication that helped grow the company from 20+ employees to over 300 (at any one given time).

I was very shocked to hear of the allegations brought forth about Karen. Never in 14 years of working with Karen, did I witness or suspect Karen of illegal or unethical actions. Knowing her the way I do, I know that Karen did not act out of greed or a desire to harm anyone. She worked with a tough senior management team and it saddens me to know that because of her title and position, it has brought her to this place in her life. I have remained friends with Karen since her departure from Redflex, because Karen is one that I look up to and honor unconditionally. Karen has helped the community by giving back to homeless animals, and has helped others that needed financial assistance (even if she didn't have the money to give). Despite this case, I still believe that Karen is a good and honorable person. I don't believe that her conduct in this case reflects her true personality.

In my eyes, Karen has paid the price for her actions since her departure. She is deeply ashamed and remorseful for her participation in the offense. It is unlikely that she will ever work in the corporate sector again. And while she has made efforts to be productive, She has not even been able to hold down a minimum wage position due to the public nature of this case. Her lifestyle has been diminished considerably and she has real financial concerns that she may not recover from. Karen is also worried about being separated from her elderly and infirm parents, who depend on her a great deal. I pray for Karen and her family each and every night in hopes that the sentence imposed on Karen is as minimal as possible and that she will soon be able to put this case behind her.

If you have any questions, I will always be available to speak on behalf of Karen Finley. Thank you for considering my letter.

Sincerely,

Sandra L. Stevens

May 16, 2016

Dear Judge Smith:

My name is Amy Wolff of Scottsdale, Arizona. Please accept this letter as a sincere and impassioned character reference for Mrs. Karen Finley. I hope my letter gives you additional and positive insight into Karen's personality before imposing a sentence.

By introduction, I am a self-employed Interior Designer with an additional 20 years executive experience in marketing and advertising. My husband, Larry, is a 20+ year corporate executive. We try to lead our lives by the Golden Rule and believe we associate with people of similar values. I believe that Karen is one these people.

I met Karen about four years ago through the Arizona Weimaraner Rescue, a not-for-profit organization that rescues homeless, abandoned, and surrendered dogs (many with various issues and serious illnesses) and finds them great forever homes. Karen and her husband, Tim, have been extremely generous and caring to this organization by frequently hosting fundraising events at their home, as well as adopting dogs and fostering on a regular basis. Their time and dedication to support the Rescue has a dramatic effect on the lives of these animals as well as the families.

I also had the privilege of providing some Interior Design work to Karen and Tim while she was still employed. In doing business with her, I found Karen to be quite humble, very considerate of me and my team, fiscally responsible, honest, and a pleasure to do business with.

My husband and I have become very good friends with Karen and Tim – frequently socializing and visiting each other's homes. We are aware of Karen's conduct, her guilty plea, and the extreme sorrow that she feels for her participation in this offense. This has been a lengthy, devastating time for Karen and those around her. She has already paid a large penalty, socially and monetarily, by having her story on the front page of local newspapers numerous times and then being unable to keep even a minimum wage job because of that. At the same time this serious situation was unfolding, Karen's sister, who she was extremely close with, suddenly and tragically passed away – bringing yet more sorrow to Karen and her family.

Although, I haven't known Karen for a lifetime, I am certain she is a lifetime friend. I have always been moved by her warmth, compassion, generosity and integrity. She is a very loving, caring, fair human being and the crimes for which she pled guilty do not fit the character of the person I know. Due to the confidence I have in her, I remain Karen's friend and still believe she is worthy of your leniency.

Very Sincerely Yours,

Amy Wolff

July 7, 2016

Re: Character Letter for Karen Finley

To: The Honorable George C. Smith:

My name is Jennifer R. Dwiggins. I am currently the Director of Customer Service at Great American Merchandise and Events in Scottsdale, AZ, responsible for Customer Service and Operations. I have been in this job since June 1, 2015. I am 51 years old and have lived in Arizona since October 1990.

I have known Karen Finley since December 2003 when she hired me at Redflex Traffic Systems as a Senior Operations Manager. Prior to taking the position at Redflex, I worked for 10 years at GTE/Verizon as a Section Manager in the Health Services Division. I worked directly for Karen from the time I was hired at Redflex until she left in February 2014. I left Redflex in May 2015.

One concern I had when taking the job at Redflex was that I would have to act as the Corporate Custodian of Records and testify in court as to the chain of custody of the evidence gathered by our systems and staff at Redflex. I recall telling my parents that if I was ever expected to bend the truth in any way on the stand, I would resign immediately. Before taking the job, I didn't know about the integrity of the company or the people I would be working with. Within 6 months I told my parents that I no longer had any fear associated with this role, as long as Karen was my direct boss, because she made it infinitely clear that nothing but the truth should be testified to in court regarding the systems, regardless of the outcome of the case. That gave me great comfort that she was a person that I could trust. In all of the time that I worked with Karen, she never personally asked me to do anything that made me uncomfortable or that I felt was wrong.

Despite her conduct in this case, Karen was an excellent boss and a dedicated worker. She put her heart and soul into the success of our company. She worked hard, was focused on customer satisfaction, and made the safety standards demanded by our law enforcement customers top priority. Karen also cared immensely about our employees, our customers and our Board of Directors and Shareholders.

To this day, in my heart of hearts, I do not believe that Karen is bad or unethical person. I don't believe that she started working at Redflex with the intent on breaking the law. I also know that she was not the person who originated the conduct in this case. Karen was always someone who had high integrity. I am certain that her conduct in this case does not reflect her true character. I am also certain that Karen's conduct is not the product of greed or a desire to hurt anyone.

That is why I have remained friends with Karen since her departure from Redflex. I truly believe in her strength of character. In the aftermath of this case, Karen has acted with

courage and accountability.  She accepted responsibility for her conduct and testified at trial.  I know this could not have been easy for her.

Karen also apologized to me personally about this case.  She feels terrible shame and remorse that many Redflex employees lost their jobs after this case came to light.  I know that Karen will carry this weight on her shoulders for a long time.  It is very obvious to me that Karen would do things differently today.  I believe that Karen has learned a great deal from this case and that she would be a stronger person if ever faced with a situation like this again.

In sentencing Karen, I pray that you will see that Karen cared dramatically about the company, the employees and the customers.  I also ask that in judging Karen you don't only look at her conduct in this case, but also at the fact that Karen is a good and kind person.  Please exercise leniency and mercy in sentencing my friend.  She has already suffered a great deal.  Her life will never be the same.

If you have any questions, I will always be available to speak on behalf of Karen Finley.

Sincerely,

Jennifer R. Dwiggins

Honorable George C. Smith
United States District Judge
Southern District of Ohio

July 8, 2016

Dear Judge Smith:

My name is Rebecca Kapp. I live in Glendale, Arizona and work as a realtor. I am also the founder of Arizona Weimaraner Rescue, a non-profit dog rescue organization. This letter is for Karen Finley.

I have known Karen Finley since 2010, when she adopted her first rescue from Arizona Weimaraner Rescue. Since that time she has been one of the biggest Volunteer assets we have. She has fostered many homeless dogs until we could find them homes. It is extremely difficult to find anyone to help with the older senior rescues. Karen has never turned down caring for the older ones that are 9+ yrs. She is always willing to help when we have public adoption events throughout the city. Karen's dedication to our organization and her compassion towards the dogs, especially the senior dogs, reflects on Karen's excellent character as a human being.

In addition to helping foster dogs, Karen also volunteered a great deal of time and resources to improving our organization. Karen readily understood the importance of becoming a 501c3 Non-Profit Organization. We had been struggling with this effort for sometime because of time allowance and the costs involved. She knew this status would make us eligible for grant funding, tax deductible donations, and allow us to join major organizations which require all participants be 501c3. She oversaw the process and generously paid all expenses to make this possible. This has made a difference of visibility for us not only in our local area but also in many national organizations. She has helped with fund raisers to cover incurred vet bills of animals that needed extensive medical care. We never turn an animal away because of the medical expense. At times we have not quite met the amount to pay our vet bills, Karen generously helped pay the balance so we could save a life.

Annually she hosts 2 events at her home to raise funds for medical expenses. She pays 100% of the expense to host the event in addition to opening her home to 40-50 Weimarners and their owners for a day of great fun!! We have become known for our events at "Weimaraner Paradise", what we call Karen's home during these events. The loss of these events would leave a big hole in our annual fund rising.

Another fund raising event we host is our annual holiday gift wrap at one the major business centers in Phoenix that runs from the day after Thanksgiving until Christmas Eve. Some days this past year we wrapped over a 100 packages per day. A very busy time of year to get helpers you can count on; Karen came out multiple times to help wrap and is one of the most reliable volunteers we have. She is always willing to help no matter what the task.

I ask you please take into consideration all the help and time Karen gives that enables us to serve the public and our ongoing mission to save 100+ homeless Weimaraners in our community per year.

Without Karen's help and participation, it will certainly be a noticeable decline in the numbers of dogs we can save from being euthanized.


Thank you for considering my letter.


Sincerely,

Rebecca Kapp, Founder
Arizona Weimaraner Rescue